UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

Thurgood Marshall U.S. Courthouse   40 Foley Square, New York, NY 10007 Telephone: 212-857-8500

MOTION INFORMATION STATEMENT

Docket Number(s): 23-263 _____     _____ Caption [use short title] _____

Motion for: Stay pending appeal. _____

_____

_____

Set forth below precise, complete statement of relief sought:

Plaintiff-Appellants John Does 1-7 seek a stay pending

appeal of the district court's February 21, 2023 order.

John Does 1-7 v. Taliban

MOVING PARTY: John Does 1-7 _____     OPPOSING PARTY: Federal Reserve Bank of New York _____

[✔] Plaintiff        [ ] Defendant

[ ] Appellant/Petitioner   [ ] Appellee/Respondent

MOVING ATTORNEY: John Thornton _____     OPPOSING ATTORNEY: Katherine Landy _____

[name of attorney, with firm, address, phone number and e-mail]

do Campo & Thornton, P.A. _____     Federal Reserve Bank of New York _____

150 S.E. 2nd Avenue, Suite 602, Miami, FL 33131     33 Liberty Street, New York, NY 10045

jt@dandtlaw.com (305)358-6600     kathrine.landy@ny.frb.org

Court- Judge/ Agency appealed from: SDNY (Daniels, J.) _____

Please check appropriate boxes:

Has movant notified opposing counsel (required by Local Rule 27.1):
[✔] Yes   [ ] No (explain): _____
_____

Opposing counsel's position on motion:
[ ] Unopposed   [ ] Opposed [✔] Don't Know
Does opposing counsel intend to file a response:
[ ] Yes   [✔] No   [ ] Don't Know

FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUCTIONS PENDING APPEAL:

Has this request for relief been made below?   [✔] Yes [ ] No
Has this relief been previously sought in this court?   [ ] Yes [✔] No
Requested return date and explanation of emergency: _____
_____
_____
_____
_____

Is oral argument on motion requested?   [ ] Yes [✔] No (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?   [ ] Yes [✔] No  If yes, enter date: _____

Signature of Moving Attorney:

s/ John Thornton _____ Date: 3-10-23 _____   Service by: [✔] CM/ECF   [ ] Other [Attach proof of service]

Form T-1080 (rev.12-13)

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

| | |
|---|---|
| JOHN DOES 1-7, *et al.*,<br><br>      Judgment Creditors-Appellants,<br><br>v.<br><br>THE TALIBAN, *et al.*,<br><br>      Judgment Debtors,<br><br>FEDERAL RESERVE BANK OF NEW YORK,<br><br>      Garnishee-Appellee. | On Appeal from the United States District Court for the Southern District of New York (Daniels, J.)<br><br><br>No. 23-263 |

## MEMORANDUM OF LAW IN SUPPORT OF JUDGMENT CREDITORS-APPELLANTS' MOTION FOR STAY PENDING APPEAL

## **TABLE OF CONTENTS**

I.  Preliminary Statement ...........................................................................1

II. Background ..........................................................................................3

   A.  The Doe Creditors' Judgment and Collection Efforts ..................................3

   B.  Other Parties' Pursuits Of The Assets .................................................8

   C.  Magistrate Judge Netburn's Report and Recommendation ........................8

   D.  The District Court's Order ...........................................................10

III. Argument...........................................................................................11

   A.  Legal Standard .........................................................................12

   B.  The Doe Creditors Are Entitled To A Stay.................................................12

     1.  Likelihood Of Success .............................................................12

       a.  The District Court Had Jurisdiction.................................13

       b.  A Turnover Order Would Not Violate The Separation Of Powers ........................................................................16

     2.  Irreparable Harm.....................................................................19

     3.  Hardship To Other Parties ......................................................20

     4.  Public Interest .......................................................................21

IV. Conclusion...........................................................................................22

Judgment Creditors-Appellants John Does 1-7 (the "Doe Creditors") respectfully move for a stay pending appeal of the February 21, 2023, order ("Order," Ex. A) of the Honorable George B. Daniels, which denied their motion for a turnover of assets held at the Federal Reserve Bank of New York ("FRBNY") in the name of Da Afghanistan Bank ("DAB"). This motion requests the same relief as the motion filed on March 6, 2023 in a related appeal, and in which the Doe Creditors joined. *See* Dkt. 25, *Havlish v. Bin Laden*, Case 23-258 (2d. Cir.).

## I.    Preliminary Statement

In this turnover proceeding under the Terrorism Risk Insurance Act of 2002 ("TRIA"), the district court determined that $3.5 billion in blocked assets held in New York by the Taliban-controlled DAB are categorically unavailable to those who have obtained terrorism judgments against the Taliban. That decision is wrong at every level. It rewrites TRIA, a statute whose plain text demonstrates Congress's unambiguous intention to make blocked assets controlled by terrorist parties available to compensate their victims. It renders an empty gesture the decision of the President that these blocked assets "remain in the United States subject to ongoing litigation by U.S. victims of terrorism" precisely to ensure that the victims "will have a full opportunity to have their claims heard in court." *See* Exec. Order No. 14,064, 87 Fed. Reg. 8391 ("E.O.," Ex. B). The decision affects not only the Doe Creditors, but also three other groups of judgment creditors who hold judgments against the

1

Taliban for 9/11, as well as thousands more.[1] Doe Creditors are prepared to demonstrate in the course of this appeal why the district court's order must be reversed.

To protect their "full opportunity" to pursue the assets, Doe Creditors now ask the Court to enter a stay pending appeal in order to preserve the status quo. A stay is necessary to ensure that, if this Court determines that the district court erred and that they and the other terror victims are entitled to recover, the assets in question will still be available for collection. Other plaintiffs, who do not yet hold money judgments, continue to pursue the assets for themselves. If any of those efforts are successful, it would risk mooting the appeal, undermining this Court's jurisdiction, and depriving the judgment creditors that levied writs of execution rights to meaningful appellate review of an erroneous decision.

---

[1] The three plaintiff groups in the Multi-District Litigation concerning the 9/11 attack, Case No. 03-MD-1570 in the United States District Court for the Southern District of New York (the "MDL") that, like the Doe Creditors, had obtained judgments against the Taliban and served writs of execution on the FRBNY, have entered into a distribution plan (the "Framework Agreement") that, in the event of a turnover order, would distribute some of their share of the Taliban-controlled assets to the overwhelming majority of the 9/11 claimants in that litigation who have not yet secured money judgments or any rights to those assets. *See* MDL Dkt. 7790. Doe Creditors are not part of the Framework Agreement.

## II. Background

### A. The Doe Creditors' Judgment and Collection Efforts

The Doe Creditors were civilian contractors in Afghanistan who were injured in a suicide bomb attack on January 4, 2016, by the Taliban and co-conspirators Al-Qaeda and the Haqqani Network. The Doe Creditors timely sought justice in the courts, and on November 5, 2020, the Doe Creditors obtained a judgment against the Taliban and its co-conspirators, *see* Final Default Judgment, *John Does 1-7 v. The Taliban, et al.*, No. 04-CV-00605 (N.D.Tex), Dkt. 22. On December 14, 2020, Doe Creditors registered their judgment in the Southern District of New York. Doe Dkt. 1. They hold an enforceable judgment for compensatory damages with more than $138 million outstanding.

On August 15, 2021, the Doe Creditors saw the Taliban, the entity that attacked them, return to power in Afghanistan. The Taliban took over DAB. Individuals involved in planning and financing Taliban bomb attacks, likely the very individuals involved in the attack on Doe Creditors, have assumed senior positions

at DAB.[2] In light of the takeover of DAB by Taliban terrorists, the United States froze DAB assets.[3] At that time, DAB held approximately $7 billion at the FRBNY.[4]

On August 26, 2021, the Doe Creditors filed an Emergency Motion for a Writ of Execution to attach the frozen assets held at the FRBNY. The motion provided legal and factual support for the issuance of a writ of execution, namely 1) that the Doe Creditors held a judgment against terrorist parties; 2) that the judgment was based on an act of terrorism; and 3) that according to TRIA definitions, the assets at issue are "blocked assets" "of a terrorist party judgment debtor or an agency or instrumentality of that terrorist party judgment debtor." Doe Dkt. 15. Due to the district court delaying the consideration of the motion, the Doe Creditors did not receive a writ until September 27, 2021.[5] Doe Creditors delivered their writ of execution to the U.S. Marshal on December 14, 2021, and the U.S. Marshal served

---

[2] For example, a senior Taliban military and financial leader sanctioned for managing funds intended for bombs was named Second Deputy Governor of DAB. *See* Doe Dkt. 82-1 at 21.

[3] *See* Doe Dkt. 15, n. 1 citing to Eshe Nelson & Alan Rappeport, *U.S. and I.M.F. Apply a Financial Squeeze on the Taliban*, N.Y. Times (Aug. 18, 2021), https://www.nytimes.com/2021/08/18/business/afghan-central-bank.html.

[4] *Id*.

[5] On September 23, 2021, the District Court denied the Doe Creditors' motion requesting that it issue an order directing the Clerk to issue a writ, and instead specifically instructed Doe Creditors that "the proper process for issuance of a writ of execution against property in this District is to send a physical copy of the writ of execution … to the Orders and Judgment Clerk …". Memo Endorsed, Doe Dkt. 26.

it on the FRBNY on January 3, 2022. *See* Doe Dkt. 67, Process Receipt and Return from the Unites States Marshals Service.

As of January 3, 2022, Doe Creditors and the judgment creditors in the matter of *Havlish v. Bin-Laden*, Case No. 03-CV-9848, 03-MD-1570 (S.D.N.Y), hereinafter "Havlish Creditors", were the only parties with final judgments against the Taliban; were thus the only plaintiffs able, and entitled, to judicially restrain the assets; and were the only parties who had done so through the service of a writ of execution. Given that the compensatory damages claimed by the Havlish and Doe Creditors totaled approximately $2.2 billion combined, much less than the approximately $7 billion of blocked assets held by the FRBNY, the Doe Creditors had established a priority position sufficient to secure the hoped-for recovery of their entire outstanding compensatory judgment of over $138 million. *See* N.Y. C.P.L.R. § 5234(b) (executions "shall be satisfied . . . in the order in which they were delivered"); *CSX Transp., Inc. v. Island Rail Terminal, Inc.*, 879 F.3d 462, 472 (2d Cir. 2018).

On February 11, 2022, President Biden formally blocked all DAB's property in the United States, including the $7 billion at the FRBNY. *See* E.O., Ex. B; Doe Dkt. 49 (U.S. Statement of Interest). President Biden determined that half— approximately $3.5 billion—would be set aside for humanitarian purposes in Afghanistan under a Treasury Department license. The other half was to remain at

the FRBNY, subject to enforcement actions by terror victims. *Id*. The remaining amount was still sufficient to satisfy the Havlish and Doe Creditors writs, which held the first two positions of priority.

On February 16, 2022, Doe Creditor's case was transferred to the Honorable George B. Daniels as related to the MDL docket, and Doe Creditors were ordered to make filings related to the execution against assets of the Taliban in the MDL docket as well as their own docket. Doe Dkt. 54-55.

On March 20, 2022, the Doe Creditors moved for a turnover of the DAB assets. *See* Turnover Motion, Ex. C. Doe Creditors argued that they are entitled to execute on DAB's assets under Section 201(a) of TRIA, Pub. L. No. 107–297, 116 Stat. 2322 (codified at 28 U.S.C. § 1610 note), which provides that:

> Notwithstanding any other provision of law, . . . in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, . . . the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

Their motion and supporting expert declaration make clear their entitlement to turnover under a straightforward application of TRIA. They have a "judgment against" the Taliban "on a claim based upon an act of terrorism," and therefore— "[n]otwithstanding any other provision of law"—they are entitled "to satisfy such

judgment" by "execut[ing]" on "the blocked assets of any agency or instrumentality" of the Taliban, including DAB.

The Havlish Creditors moved for turnover at the same time,[6] and soon thereafter, two other groups that subsequently served writs of execution on FRBNY concerning the blocked DAB assets likewise moved for turnover.[7] The four groups with pending turnover motions joined on common issues to make filings as "Joint Creditors". One MDL plaintiff group, the Ashton Plaintiffs, which had not secured a money judgment against the Taliban and did not join in the Framework Agreement, opposed the turnover motions (*see* MDL Dkt. 7894).[8] They did so on the meritless grounds that the district court should disregard longstanding rules of priority and devise its own distribution scheme, irrespective of which parties have legal entitlement to the assets. *See* Doe Dkt. 106.[9]

---

[6] *See* MDL Dkt. 7763 (March 20, 2022, motion of Havlish Creditors).

[7] *See* MDL Dkt. 7936 (April 2022 motion of Federal Insurance Co., *et al*.); *Smith v. Islamic Emirate of Afghanistan*, No. 01-CV-10132 (S.D.N.Y.), Dkt. 62 (May 2022 motion of Estate of George E. Smith, *et al*.).

[8] The district court allowed the Ashton Plaintiffs, despite the fact they had no standing, to lodge an opposition to the Doe Creditors' turnover motion by filing it on the MDL docket.

[9] Additionally, a subset of the Ashton Plaintiffs collaterally attacked the turnover proceedings by filing a putative class action styled *In re Approximately $3.5 Billion of Assets on Deposit at the Federal Reserve Bank of New York in the Name of Da Afghanistan Bank*, No. 22-CV-3228-GBD (S.D.N.Y.).

B.     Other Parties' Pursuits Of The Assets

Several other groups outside the MDL are pursuing the DAB assets. After the Havlish and Doe Creditors had levied on the assets, two groups of victims of the 1998 bombings of U.S. embassies in Africa sued the Taliban, more than 23 years after those attacks. Neither case has yet resulted in a judgment. Plaintiffs in *Owens v. the Taliban*, No. 22-CV-1949-VEC (S.D.N.Y.), obtained a prejudgment writ of attachment over the DAB assets on March 21, 2022, *see Owens* Dkt. 32, subsequently vacated by Judge Caproni on foreign sovereign immunity grounds, *see Owens* Dkt. 82.[10] In October 2022, 5,000 other victims of the embassy bombings sued the Taliban and DAB, expressly referencing the DAB assets in their complaint. *See Bushnell v. Islamic Emirate of Afghanistan*, No. 22-CV-8901-JSR (S.D.N.Y.). Judge Rakoff has scheduled a default judgment hearing for March 29.

C.     Magistrate Judge Netburn's Report and Recommendation

On August 26, 2022, Magistrate Judge Netburn issued a Report and Recommendation ("Report," Ex. D) recommending denial of the Joint Creditors' turnover motions. The Report acknowledged that the Joint Creditors "easily" satisfied all but one element of TRIA. Report, Ex. D. at 29. The Report further found that, as a factual matter, the Taliban controls DAB and is using it to advance its aims,

---

[10] The *Owens* plaintiffs have indicated that they will appeal from Judge Caproni's order. *See Owens* Dkt. 84.

*id.* at 33—a finding that is sufficient to make DAB an agency or instrumentality of the Taliban. *See Kirschenbaum v. 650 Fifth Ave. & Related Props.*, 830 F.3d 107, 135 (2d Cir. 2016), *abrogated on other grounds, Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018).

Judge Netburn nonetheless recommended that turnover be denied. The Report first concluded that DAB is immune from the court's subject-matter jurisdiction under Section 1604 of the Foreign Sovereign Immunities Act ("FSIA"). Report, Ex. D. at 12-27. It additionally concluded that it could not find that DAB is an agency or instrumentality of the Taliban because doing so would imply recognition of the Taliban as the government of Afghanistan, in violation of the constitutional separation of powers. *Id.* at 27-37.[11]

The Joint Creditors submitted objections to the Report. *See* "Objections," Ex. E. They first argued that the court had subject-matter jurisdiction, and that the Report was wrong that their turnover proceeding implicated the immunity afforded foreign states from *in personam* claims. This turnover proceeding is a garnishment action against the FRBNY, not an *in personam* action against a foreign state. Under such circumstances, federal courts have jurisdiction and the FSIA's jurisdictional

---

[11] The Report also concluded that TRIA requires that an agency or instrumentality of a terrorist party must consensually enter its relationship with the terrorists, and that DAB had not. *Id.* 37-41. Judge Daniels rejected this conclusion. *See* Order, Ex A. at 2, n.5.

immunities are not implicated. *See* Objections, Ex. E. at 22-28. And even if the FSIA did confer immunity, TRIA would restore jurisdiction. As this Court has repeatedly held, "TRIA provides courts with subject matter jurisdiction over post-judgment execution and attachment proceedings against property of a foreign state 'in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism[.]'" *Vera v. Republic of Cuba*, 867 F.3d 310, 321 (2d Cir. 2017) (quoting TRIA § 201(a)).

Second, the Joint Creditors demonstrated that the Court could grant turnover without recognizing the Taliban as Afghanistan's government. *See* Objections, Ex. E. at 43-51. Under TRIA, to find that DAB is an instrumentality of the Taliban, a court need only find that DAB is controlled or used by the Taliban; it need not determine that such control is legitimate. And a court's factual finding that the Taliban controls DAB would not bestow formal U.S. recognition on the Taliban regime or impact the President's position on Afghanistan's government, which is all that the Constitution precludes.

D.  The District Court's Order

On February 21, 2023, Judge Daniels overruled the objections and adopted two of the Report's three bases for denying turnover. *See* Order, Ex. A. The district court "adopt[ed] [the Report's] finding[s] that this Court lacks subject-matter jurisdiction over the turnover motions under the FSIA … and that this Court is

constitutionally restrained from determining the Taliban is the legitimate government of Afghanistan as required to attach DAB's assets." *Id*. at 2. In so doing, the district court failed to address the Joint Creditors' objection that any jurisdictional immunities DAB might enjoy as a foreign sovereign are irrelevant because this case is not "a suit against a foreign state." *United States v. Assa Co.*, 934 F.3d 185, 189 (2d Cir. 2019); Objections, Ex. E. at 23-28. And the district court erroneously resolved the questions it did address, including by misconstruing Circuit precedent recognizing that TRIA creates an exception to jurisdictional immunity otherwise afforded by the FSIA. *See infra* III.B.i; Objections, Ex. E. at 28-29.

The district court also denied the Joint Creditors' request to stay its judgment pending appeal. Doe Dkt. 144 (motion); "Stay Order," Ex. F. The Joint Creditors are all appealing, and intend to move to consolidate the appeals. The Havlish Creditors moved for a stay before this Court, and Doe Creditors joined. *See infra* at 1.

## III.  Argument

This Court should preserve the status quo pending appeal by confirming that the DAB assets continue to be restrained and will thus be available for collection if this Court reverses. The Doe Creditors are likely to succeed on the merits, they would be irreparably harmed if the assets dissipate during the pendency of the appeal, a stay would not prejudice any other party, and a stay would advance the public interest in the enforcement of terrorism judgments.

A.    <u>Legal Standard</u>

In assessing applications for stays pending appeal, this Court considers: (1) whether the applicant is likely to succeed on the merits; (2) whether the applicant will be "irreparably injured" absent a stay; (3) whether a stay would "substantially injure" other parties; and (4) the public interest. *See United States v. Grote*, 961 F.3d 105, 122–23 (2d Cir. 2020).

Courts regularly stay pending appeal the effect of orders denying turnover motions, opting to maintain restraints on the property. *See, e.g., N. Mariana Islands v. Millard*, 287 F.R.D. 204, 215 (S.D.N.Y. 2012); Memorandum & Order at 22, *Tire Eng'g & Distrib. L.L.C. v. Bank of China Ltd.*, No. 12-CV-9208-ALC (S.D.N.Y. Apr. 12, 2013), ECF. No. 41; *Levin v. Bank of New York*, 2011 WL 812032, at *22 (S.D.N.Y. Mar. 4, 2011); *Shaheen Sports, Inc. v. Asia Ins. Co.*, 2012 WL 919664, at *9 (S.D.N.Y. Mar. 14, 2012).

B.    <u>The Doe Creditors Are Entitled To A Stay</u>

1.    *Likelihood Of Success*

The Doe Creditors are likely to succeed on the merits of this appeal. *See* Objections, Ex. E. at 17-60. They readily satisfy each element of TRIA § 201(a). They have "judgments against a terrorist party" (the Taliban) "on a claim based upon an act of terrorism". They are seeking to satisfy those judgments by executing against "the blocked assets of" DAB, which is an agency or instrumentality of the Taliban. *See* E.O., Ex. B. The factual record below, which included a detailed and

undisputed expert declaration, *see* Doe Dkt. 82-1 ("Zerden Decl.," Ex. G), demonstrates that DAB is "owned, controlled, or directed by" the Taliban, *id*. ¶¶ 49-143, and therefore is the Taliban's "agency or instrumentality" within the meaning of TRIA. *Kirschenbaum*, 830 F.3d at 135. As the Magistrate Judge found—and the District Judge did not hold otherwise—"the Taliban is using their control of DAB to advance their aims." Report, Ex. D. at 33. Accordingly, DAB is a Taliban instrumentality, and its blocked assets "shall be subject to execution" to satisfy terror victims' judgments against the Taliban, "[n]otwithstanding any other provision of law." TRIA § 201(a).

The district court nonetheless denied turnover, finding that (1) the FSIA deprived it of jurisdiction, Order, Ex. A. at 10-22; and (2) acknowledging the Taliban's control of DAB would impermissibly imply recognition of the Taliban as Afghanistan's government, *id*. at 22-29. Each conclusion is wrong.

a.     The District Court Had Jurisdiction

The district court first held that it lacked jurisdiction because DAB, as Afghanistan's central bank, enjoys immunity from jurisdiction under Section 1604 of the FSIA. But there is no need to overcome DAB's supposed immunity, because this is a garnishment proceeding against the FRBNY that does not implicate Section 1604.

The Doe Creditors brought this turnover proceeding against the FRBNY as the holder of assets that they seek to garnish, not against DAB. Under New York law, to adjudicate such a proceeding, a court need not exercise jurisdiction over anyone but the garnishee. *See Koehler v. Bank of Bermuda Ltd.*, 911 N.E.2d 825, 830–31 (2009); *Harrison v. Republic of Sudan*, 309 F. Supp. 3d 46, 50 (S.D.N.Y. 2018) (jurisdiction over Sudan's central bank was not necessary to order a third-party garnishee to turn over the central bank's assets). The district court thus needed only to exercise jurisdiction over the FRBNY. And because neither the FRBNY nor the property at issue is "a foreign state," Section 1604 "does not confer immunity" from jurisdiction. *Assa*, 934 F.3d at 189; *see Peterson v. Islamic Republic of Iran*, 876 F.3d 63, 91-92 (2d Cir. 2017), *vacated*, *Bank Markazi v. Peterson*, 140 S. Ct. 813 (2020), *reinstated in relevant part*, 963 F.3d 192, 196 (2d Cir. 2020).

That this proceeding arguably involves the property of a foreign state does not change the jurisdictional analysis. "To be sure," as this Court observed in *Assa*, "the FSIA is not completely silent on immunity in actions involving a foreign state's property." 934 F.3d at 190. Section 1609 of the FSIA "states that 'the property in the United States of a foreign state shall be immune from attachment arrest and execution [subject to certain exceptions].'" *Id.* (quoting 28 U.S.C. § 1609). But as the district court itself agreed, when TRIA is satisfied, it overcomes such immunity from execution. Order, Ex. A. at 17; Report, Ex. D. at 12-13 (TRIA "defeats the

immunity from execution that the property of sovereign states and their instrumentalities normally enjoy."); *see Bank Markazi v. Peterson*, 578 U.S. 212, 217 n.2 (2016).

Skipping over the judgment creditors' argument that the FSIA's jurisdictional immunities for *in personam* claims are inapplicable, the district court proceeded to hold that TRIA does not overcome jurisdictional immunity. That is also wrong. *See* Objections, Ex. E. at 28-43. As this Court has said in a long line of cases, TRIA "confers an independent basis for subject matter jurisdiction over post-judgment execution and attachment proceedings against property held in the hands of an agency or instrumentality of the terrorist party, even if the agency or instrumentality is not itself named in the judgment." *Kirschenbaum*, 830 F.3d at 132. This rule applies even if the "proceedings [are] against property of a foreign state." *Vera*, 867 F.3d at 321; *see also Hausler v. JP Morgan Chase Bank, N.A.*, 770 F.3d 207, 211 (2d Cir. 2014) (characterizing TRIA as a "terrorism-related exception[] to immunity under [the] FSIA"); *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 49 (2d Cir. 2010).

The district court's characterization of TRIA as abrogating only execution immunities but not jurisdictional immunities, *see* Order, Ex. A. at 15-19, cannot be squared with this wall of precedent interpreting the text of the statute, which authorizes execution "in every case" in which a person has "a judgment against a

terrorist party on a claim based upon an act of terrorism"—and TRIA does so "notwithstanding any other provision of law." *See* Objections, Ex. E. at 32-39. These broad phrases "mak[e] plain that the force of [TRIA Section 201(a)] extends *everywhere*." *Weinstein*, 609 F.3d at 49 (emphasis added). Nor does the district court's analysis comport with Congress's intent to remove sovereign immunity as an obstacle to enforcement of terror judgments. *Id.* at 39-41. As the Supreme Court has made clear, Congress's intent, expressed in statute, is the last word on sovereign immunities. *See Republic of Argentina v. NML Cap., Ltd.*, 573 U.S. 134, 141-46 (2014).

### b. A Turnover Order Would Not Violate The Separation Of Powers

Next, the district court held that it could not authorize execution because finding that the Taliban controls Afghanistan's central bank purportedly would implicitly recognize the Taliban as Afghanistan's government, in violation of the President's exclusive authority to "formally" recognize foreign governments. *See Zivotofsky v. Kerry*, 576 U.S. 1, 20 (2015). This, too, is wrong. To find that DAB is an instrumentality of the Taliban under TRIA, the Court need only conclude that, as a factual matter, the Taliban controls DAB, *Kirschenbaum*, 830 F.3d at 135, which is not in dispute, *see* Order, Ex. A. at 25, Report, Ex. D. at 33. There is no basis for the district court's concern that to "find[] that the Taliban regime is in control of DAB" necessarily implies that the Taliban "acts as the government of Afghanistan."

16

Order, Ex. A. at 27. Accepting the Taliban's control over DAB does not dictate any conclusion about whether such control is legitimate or governmental. Indeed, legitimacy and governmental control are characteristics not normally associated with nonstate terrorist organizations, and yet such organizations are expressly included in TRIA's purview. *See Kirschenbaum*, 830 F.3d at 133.

Moreover, even if the court were to find that the Taliban "acts as the government of Afghanistan," Order, Ex. A. at 27—or, to use the Secretary of State's formulation, that the Taliban is Afghanistan's "*de facto*" government, *see* Objections, Ex. E. at 51 n.59—that would not amount to prohibited recognition. "Decisions by courts in the United States to the effect that unrecognized regimes have certain powers to act within the territory controlled by them . . . do not constitute recognition of such regimes." *Restatement (Second) of Foreign Relations Law* § 106, cmt. b (1965). The President's exclusive power to recognize foreign governments "extends no further than his *formal* recognition determination," *Zivotofsky*, 576 U.S. at 30 (emphasis added), and a court's factual finding neither confers formal recognition nor interferes with the Executive Branch's authority.

Finally, in writing its "Conclusion" the district court revealed how far it had strayed from TRIA and this court's jurisprudence concerning it. It states that "the Taliban—not the former Islamic Republic of Afghanistan or the Afghan people— must pay for the Taliban's liability in the 9/11 Attacks [*sic*]". Order, Ex. A. at 30.

This statement reveals that the district court simply does not agree with TRIA's mandate that a district court must order execution against assets of an *instrumentality* of a terrorist, without limitation, just as it would of assets of the terrorist itself, to satisfy judgments against the terrorist that controls it.

Further, its identification of the DAB assets as assets of "the former Islamic Republic of Afghanistan or the Afghan people", without mentioning DAB, the undisputed holder of the bank account, flies in the face of this circuit's jurisprudence concerning what property rights qualify an asset for TRIA collection. This circuit undeniably recognizes legal property rights, to the exclusion of equitable ones, in determining the application of TRIA. *See Calderon-Cardona v. Bank of N.Y. Mellon*, 770 F.3d 993 (2d Cir. 2014); *Doe v. JPMorgan Chase Bank, N.A.*, 899 F.3d 152 (2d Cir. 2018). The district court did the reverse.[12]

For these reasons, the Order is unlikely to withstand appellate scrutiny. At the very least, as Judge Kaplan acknowledged in staying an order denying turnover in a

---

[12] And in doing so, it ignored that, if the assets are not enjoyed by the Taliban's victims, that they will be enjoyed by the Taliban itself, if anyone. The U.S. Government has already licensed DAB assets to flow to "the Taliban". *See* General License No. 14, Department of the Treasury, Office of Foreign Assets Control: Authorizing Humanitarian Activities in Afghanistan (September 24, 2021), https://home.treasury.gov/system/files/126/ct_gl14.pdf. Only in an alternate universe would DAB assets reach the now non-existent Islamic Republic of Afghanistan. If they are not executed against pursuant to TRIA, they will eventually be transferred to the Taliban or an entity under Taliban control, or they will sit blocked in perpetuity, the two fates that TRIA was enacted to prevent.

case of first impression, the judgment creditors' "argument[s] have sufficient force amidst admittedly murky concepts to eventually have a fair chance of success on the merits." *Millard*, 287 F.R.D. at 215.[13]

2.    *Irreparable Harm*

The Doe Creditors would be irreparably harmed absent a stay to preserve the entirety of the status quo that existed prior to the Order. Under that status quo, the assets are subject to judicial restraints, preventing them from dissipation. Absent a stay, the assets may no longer be collectible in the event this Court reverses. Courts in similar circumstances have found that the dissolution of a judicial restraint on a judgment debtor's property would irreparably harm the judgment creditor, warranting a stay pending appeal. *See Millard*, 287 F.R.D. at 215; *Shaheen Sports*, 2012 WL 919664, at *9; *cf. Republic of Philippines v. Marcos*, 806 F.2d 344, 356 (2d Cir. 1986) (affirming injunctive relief "to prevent a defendant from making a judgment uncollectible").

In denying a stay, Judge Daniels concluded that, because the judgment creditors "did not have access to the DAB funds prior" to its decision and "do not have access to the DAB funds after" it, that the status quo is "undisturbed" by the

---

[13] In denying a stay pending appeal, the district court summarily concluded that the Joint Creditors could not succeed on the merits "[f]or the reasons provided in" the decision denying turnover. Stay Order, Ex. F. at 3. But if that were a sufficient reason for denying a stay, no district judge would ever grant one.

19

Order. Stay Order, Ex. F. at 3. That assessment fails to account for the consequences of the Order for the judgment creditors. Other parties—parties who did not even have claims on file against the Taliban until 2022—will seek to jump ahead of the Joint Creditors and those who stand to benefit from them.[14] That would be profoundly unjust.

### 3.    *Hardship To Other Parties*

By contrast, a stay would cause no "substantial injury to the nonmoving part[ies]." *New York v. Dep't of Homeland Sec.*, 974 F.3d 210, 214 (2d Cir. 2020). The Taliban and DAB—who are on notice but have not appeared to contest turnover or challenge the writs of execution—cannot claim to be harmed by an order temporarily maintaining the status quo. The FRBNY would, if anything, benefit from an order preserving the status quo, so as to reduce the possibility of confusion over what it may do with the assets during the appeal. Nor would an order preserving the status quo harm other claimants. Any claimant who has articulated an alternative means of executing on the assets will be free to pursue such a path during this appeal and to secure their position in line. Should this Court affirm, other claimants will have every opportunity to pursue their theories for execution.

---

[14] The fact that the assets are blocked would not prevent another judgment creditor from serving a TRIA writ.

4.    *Public Interest*

Finally, the public interest supports a stay. Courts regularly find the fourth factor satisfied when a stay would protect a creditor's ability to satisfy a judgment. *See, e.g., Millard*, 287 F.R.D. at 215. As this Court has recognized, "the interests of the United States weigh heavily" even in "private lawsuit[s] brought by individual victims of terrorism," which are "a mechanism for protecting the public's interests through private enforcement." *Linde v. Arab Bank, PLC*, 706 F.3d 92, 112 (2d Cir. 2013).

In concluding otherwise, the district court collapsed the public-interest inquiry with its assessment of appellants' likelihood of success, holding that a stay was not in the public interest because the judgment creditors "have established no . . . right" to execute on the assets. Stay Order, Ex. F at 5. That misses the point. A stay to preserve the judgment creditors' ability to recover if this Court sees the merits differently is profoundly in the public interest in this case, where the President has specifically given the judgment creditors "a full opportunity to have their claims heard in court;" where the government has confirmed its "compelling interest in permitting victims of terrorism to obtain compensation to the greatest degree permitted under the law," Doe Dkt. 49 at 19.

IV.    **Conclusion**

This Court should stay the effect of the Order during the pendency of this

appeal, preserving the status quo and all judicial restraints on the property that were

in effect prior to that order.

 March 10, 2022

Respectfully submitted.

do Campo & Thornton, P.A.
150 S.E. 2nd Avenue, Ste. 602
Miami, Florida 33131
(305) 358-6600

s/ John Thornton
John Thornton
jt@dandtlaw.com
Tel: (305) 358-6600

s/ Orlando do Campo
Orlando do Campo
od@dandtlaw.com
Tel: (305) 358-6600

## CERTIFICATE OF COMPLIANCE

I certify that this document complies with the type volume limitations of Fed. R. App. P. 27(d)(2)(A) because it contains 5,186 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f).

I further certify that this document complies with Fed. R. App. P. 27(d)(1)(E), because it complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6). This document has been prepared using Microsoft Word in 14-point Times New Roman, a proportionally spaced typeface.

I further certify that, pursuant to L.R. 27.1, undersigned counsel notified counsel for the Federal Reserve Bank of New York for its position on this matter and it has stated that it takes no position on this motion and does not intend to file a response.

/s/ John Thornton